## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Eric Fenton, first being duly sworn, do hereby aver, depose, and state as follows

**Location to be searched:** This affidavit is submitted in support of an application for a warrant to search the following place:

> FOR THE ENTIRE REAL PROPERTY, IMPROVEMENTS, AND PREMISES KNOWN AS 615 LONGFELLOW STREET, N.W., WASHINGTON, D.C.. THE BUILDING AT THIS ADDRESS IS A TWO-STORY, TAN-BRICK, ATTACHED DUPLEX. THE NUMERALS "6" "1" "5" ARE POSTED ON A BROWN PLATE, ATTACHED TO THE STRUCTURE WALL, RIGHT OF THE FRONT ENTRY DOOR. THE FRONT ENTRY DOOR IS TAN, WITH A WHITE SCREEN DOOR ATTACHED.

(1) The Affiant is familiar with the specific location to be searched and will be present to ensure that, if a warrant issues, the correct place is searched. I either know the information set forth in this affidavit from what I have observed, or it has been told to me by other sworn law enforcement officers. In the rest of this affidavit, when first-person pronouns are used, they refer to me.

## I. SUMMARY

(2) In swearing to this affidavit, I respectfully submit that probable cause exists to believe that there are within this location at 615 Longfellow Street, N.W., Washington, D.C., papers, records, documents and other evidence of a series of felony violations of the Controlled Substance Act, specifically, of Title 21, United States Code, Sections 841(a)(1). This proscribes illegal possession and distribution of such controlled substances as crack cocaine base. In March and April 2005, an undercover police officer bought crack cocaine base three times from defendant Michael A. Battle in the District of Columbia. During this time, the address of 615 Longfellow Street, N.W., Washington, D.C., was defendant Battle's residence. To the best of my knowledge, this has not changed. Each of the three sales took place within a few blocks of defendant's residence on Longfellow Street, N.W. Earlier this afternoon, a federal grand jury in Washington, D.C., indicted defendant and charged him with a number of felony crimes arising from defendant's three times selling 50 grams or more of crack cocaine base to an under cover police officer in the District of Columbia. At the time the grand jury returned the indictment, a U.S. Magistrate Judge has issued a warrant for defendant's arrest.

## II. AFFIANT'S RESUME

(3) I have been a sworn Officer of the Washington, D.C., Metropolitan Police Department (MPD) since 1997. During my career, I have been trained in standard police procedures and anti-drug-enforcement operations.

(4) Currently, I am assigned to the MPD Major Narcotics Branch's Narcotics Strike Force, and I have worked there or at its predecessors for nearly five years. In the course of my police duties, I have taken part in arresting more than 1000 persons for violating local or Federal drug laws, along with numerous gun-related crimes. I also have taken part in executing at least 85 search warrants during which police found and seized narcotics, drug paraphernalia, money, and/or firearms. In the course of my police duties, I have interviewed scores of persons arrested in Washington, D.C., on drug charges concerning their unlawful activities. Further, I have spent many hours engaged in

secret surveillance of persons involved in illegal narcotic activity. As a result of my training and experience, I have learned about how narcotic-traffickers sell drugs and organize their activities.

### III. DEFENDANT'S INVOLVEMENT IN ILLEGAL ACTIVITY

(5) Since January 2005, I have been involved in an investigation into the sale of crack cocaine base by a man known as Michael A. Battle. In this course of this investigation, an MPD undercover police officer has bought illegal drugs from defendant Battle three times, specifically about 62 grams of crack cocaine base each time. I recount below some of the main events that took place during this investigation. Earlier today, a federal grand jury indicted defendant Battle on three charges of unlawfully using a telephone to facilitate committing a drug felony, in violation of 21 U.S.C. § 843, three charges of unlawful distribution of 50 grams or more of crack cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(iii), and one charge of unlawful distribution of crack cocaine base within 1000 feet of a school, in violation of 21 U.S.C. § 860. In the course of this affidavit, I refer to the under cover police officer as "UC." I have not recounted below all of the facts known to me, but simply those necessary to set forth probable cause to search defendant's residence at 615 Longfellow Street, N.W., Washington, D.C.

(6) On March 11, 2005, at about 3:10 in the afternoon, the UC spoke by telephone with defendant, who has been identified as Michael Anthony Battle of 615 Longfellow Street, N.W., Washington, D.C. This conversation followed at least one earlier transaction between the UC and defendant. During the conversation, defendant and the UC agreed to meet for the sale, which involved a about 62 grams of crack cocaine base. The two spoke in coded phrases, "the same thing, the two," referring to two amounts of 31 grams of crack cocaine. The total of 62 grams of crack, often referred to as a "six-deuce" or a "sixty-two" is a standard mid-to-lower level wholesale quantity of drugs equal to about one-sixteenth of a kilogram. It is enough to make at least 575-to-600 rocks of crack of a size commonly sold for $10 each. In the course of the phone call, defendant agreed to meet the under cover officer in about half an hour in the neighborhood where Missouri Avenue, Madison Street, Seventh Street, and several other streets come roughly together, all in the northwest quadrant of the District. This is a few blocks from defendant's home. The sale took place after defendant and the UC met at 7th & Madison Streets, N.W., at about 4:00 that afternoon, March 11, 2005. In the sale, which took place in a specially equipped police under cover car, defendant gave the UC a little more than 60 grams of suspected crack cocaine base in exchange for $2200. The suspected crack appeared rock-like and tested positive for the presence of cocaine. The short turn-around between the phone call and the actual sale strongly suggests that defendant must have walked to the Seventh Street location from a short distance away. As noted his home is a couple of blocks south and a block or so east of 7th & Madison Streets, N.W., Washington, D.C. The UC car has been specially equipped with an audio-video recording camera, and a tape of the transaction clearly shows the exchange and defendant's face. As indicated above, based on this transaction, the indictment returned in the U.S. District Court for the District of Columbia today contains a felony charges against defendant that he unlawfully distributed crack cocaine base, in violation of 21 U.S.C. § 841(a)(1), as well as a related charge that he unlawfully used a telephone to facilitate the felony, in violation of 21 U.S.C. § 843.

(7) On March 24, 2005, shortly before 5:30 in the evening, the UC again spoke by telephone with defendant Battle. During the conversation, defendant and the UC agreed to meet for a sale of about 62 grams of crack cocaine base. During the call, defendant agreed to meet the officer near where the previous sale had taken place. When the UC got to this neighborhood, he spoke further by cell phone with defendant, who told him that uniformed police officers had been seen in the area, which now was "too hot" to conduct the sale. Instead, defendant told the UC to meet a few blocks

away near Second & Hamilton Streets, N.W. The two eventually did meet at about 7:15p.m., and defendant sold the UC 60.3 grams of crack cocaine base for $2200. The drugs sold have been analysed by the U.S. Drug Enforcement Administration's (DEA) Mid-Atlantic Laboratory, which confirmed the precise weight and that the crack was 74% pure cocaine base and precisely weighed. Again, the sale in took place in the camera-equipped police UC car. The resulting video-tape clearly shows defendant. Because defendant knew that uniformed police had been in the planned sale area, it suggests both how close he was to the site and the probability that he lives near by. The grand jury has indicted defendant for using the telephone call to arrange a drug sale, for distribution of these drugs, and for distributing the drugs within 1000 feet of a school, the Cuno-Rudolph Elementary School.

(8) On April 8, 2005, shortly before 1:00 in the afternoon, the UC again spoke by telephone with defendant Battle. During the conversation, defendant and the UC agreed to meet for a sale of about 62 grams of crack cocaine base, with the two to get together sale near 7th & Madison Streets, N.W., Washington, D.C. The two met a little before 3:30 that afternoon, and defendant sold the UC 60.5 grams of crack cocaine base for $2200. The DEA lab has analysed the crack sold and found it to be 63% pure cocaine base. This third sale also took place in the specially equipped police UC car. The resulting video-tape shows defendant. The grand jury indicted defendant for using the telephone call to arrange this drug sale and for distribution of the crack.

### IV. **DEFENDANT'S RELATIONSHIP TO PLACE TO BE SEARCHED**

(9) Throughout the course of this investigation, I have obtained information from computerized law enforcement records, including the Washington Area Law Enforcement System (WALES) and the National Crime Information Centre (NCIC). Both a WALES check and a query of the Criminal Justice Information System (CJIS) confirm that defendant resides at 615 Longfellow Street, N.W. Further, I have learned from checking MPD records that defendant has given this address before at the time of at least one earlier arrest. A confidential police informant who knows defendant personally has confirmed for me that this address is defendant's home and has told me that the place belongs to an elderly relative of defendant, possibly a grandparent. A check of real estate records shows that the property at 615 Longfellow Street, N.W., Washington, D.C., show that it is titled in the name of an A.R. Battle.

### V. **NEXUS BETWEEN PLACE TO BE SEARCHED AND EVIDENCE**

(10) Based on my training, experience and participation in narcotic and drug-related investigations and the training and experience of other Officers and Agents with whom I work closely, I know that:

> A. Most drug sellers use their homes as the main place to keep items associated with their business, including drugs they are waiting to sell, records of their business, and money they have made. Although drug sellers are engaged in an unlawful trade, they nevertheless act similarly to small or mid-level retailers, except that they must hide their inventory, income, and associated papers and paraphernalia from competitors, police, and potential robbers. Drug sellers thus like to keep their drugs, money, and business records very close to hand and to hide these things in order to maintain the most effective control over them. Even when drug sellers have a secondary business place for actual sales, such as a stash or safe house, they still typically keep contraband, proceeds, and evidence in their homes.

B. Like persons who engage in a lawful retail trade, illegal drug sellers make and keep papers that document their activities to keep track of their illegal business. These include records detailing the drugs they have ordered and those they have sold, as well as payments made and received, and money owed or owing. Such papers typically include accounting documents, receipts, notes, ledgers, bank records, and money orders. Drug sellers keep such papers or records close to hand for ready access such as in safe places in their homes.

C. Drug sellers often hide in these same places at home the money or goods they get from selling drugs, so that in such places typically are found large amounts of cash or other valuable items, which are the proceeds of the unlawful business.

D. Persons who sell illegal drugs, particularly cocaine, commonly keep close to hand, particularly at home, things used to process, cut, or cook cocaine, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, dishes and other containers for converting cocaine into cocaine base

E. Drug sellers typically keep close to hand, particularly at home, books or papers listing the names, addresses, and/or telephone numbers for their associates in the business. Drug sellers often use cell phones, pagers and telephone systems to contact their associates in the narcotic trade.

F. Drug sellers often take photographs of themselves, their associates, and their property and illegal contraband. They usually keep such photos at home.

G. Because the drug trade is illegal, cash-based, and highly profitable, drug sellers are at risk of being robbed or "muscled out" by competitors. Drug dealers associate with criminals, many of whom are prone to violence. Thus many, if not most, drug-dealers regularly carry or have close to hand guns and ammunition. They have these to protect themselves, their drugs, and their money.

## VI. CONCLUSION

(11) Based upon the facts set forth above, I respectfully request that this Court issue a warrant to search the premises at 615 Longfellow Street, N.W., Washington, D.C., for the items specified in attachment A, and to seize same if found.

_____
Officer Eric Fenton (MPD)
Metropolitan Police Department/Major Narcotic Branch
Narcotic Strike Force

JUN 1 6 2005

Sworn to and subscribed before me this _____ day of June 2005.

_____
United States Magistrate Judge

JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE

SCHEDULE A

(1) books, records, receipts, notes, ledgers, computers and magnetic storage devices, and other papers, documenting narcotics trafficking, or the identities of persons engaged in narcotics-trafficking;

(2) large sums of cash, or other valuable items such as jewelry or rare coins, representing the proceeds of illegal narcotics trafficking, plus financial documents, records, papers, ledgers, and accounting documents, which are evidence of financial transactions relating to narcotic trafficking and/or the obtaining, transferring, hiding or spending of large sums of money made from drug trafficking.

(3) rental records and real estate documents; indicia of occupancy, residence, and/or ownership of the premises described in the affidavit, but not limited to, utility and telephone bills, addressed envelopes delivered through the mail, and house keys;

(4) papers, tickets, notes, schedules, receipts, and other items relating to domestic travel, in connection with narcotics trafficking; and, in particular, documents, papers, receipts, and bills for the rental of automobiles used to transport drugs;

(5) photographs and video tapes, in particular, photographs of coconspirator and/or assets, cars, and other items of value that identify items representing the proceeds of narcotics trafficking; and,

(6) phone records, electronic beepers and pagers (and numbers contained therein), and cellular phones and records pertaining to their acquisition; and,

(7) safes or safe deposit boxes and their contents to include any narcotics, firearms, or other contraband, and any item set forth in this Schedule A.